IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gregory G. Skotnicki,  :
                Petitioner  :
                                :
           v.                :
                                  :
Insurance Department,  :    No. 156 C.D. 2015
                Respondent  :    Submitted: July 31, 2015


BEFORE:   HONORABLE DAN PELLEGRINI, President Judge[1]
             HONORABLE MARY HANNAH LEAVITT, Judge[2]
             HONORABLE ANNE E. COVEY, Judge


OPINION BY
JUDGE COVEY                          FILED: August 17, 2016


        Gregory G. Skotnicki (Skotnicki), pro se, petitions for review of the Pennsylvania Insurance Department (Department) Commissioner's (Commissioner) January 15, 2015 adjudication and order affirming Phoenix Insurance Company's (PIC)[3] cancellation of Homeowner's Insurance Policy No. 9926866966331 (New Policy) and concluding that there was no Unfair Insurance Practices Act (Act 205) violation.[4] Essentially, there are three issues for this Court's review: (1) whether substantial evidence supported the Commissioner's conclusion that PIC did not violate Act 205; (2) whether the Commissioner erred by permitting non-attorney Thomas McGilpin (McGilpin) to represent PIC; and, (3) whether the Commissioner

[1] This case was assigned to the opinion writer on or before December 31, 2015, when President Judge Pellegrini assumed the status of senior judge.

[2] This case was assigned to the opinion writer before January 4, 2016, when Judge Leavitt became President Judge.

[3] The Commissioner explained that PIC "is part of the Travelers Insurance Group[.]" Department Adj. at 1; Reproduced Record (R.R.) at 157a.

[4] Act of July 22, 1974, P.L. 589, *as amended*, 40 P.S. §§ 1171.1-1171.15.

erred by taking administrative notice post-hearing that the Department pre-approved PIC's cancellation notice form.

Skotnicki owns real property located at 400 Brentwater Road, Camp Hill, Pennsylvania (Property), which PIC insured under Homeowner's Insurance Policy No. 9754066736331 (Original Policy) since 2003. In December 2009, Skotnicki acquired a 3½-year-old English springer spaniel. On July 3, 2013, the dog bit a neighbor, requiring the neighbor to seek medical treatment. Based upon PIC Claims Adjuster Cynthia Weiser's (Weiser) July 25, 2013 interview of Skotnicki's wife Susan Skotnicki, Weiser determined that the dog acted "out of the blue" and, thus, PIC accepted liability for the neighbor's claim and paid $42,000.00 in damages. Reproduced Record (R.R.) at 61a; *see also* Skotnicki Amended Br. Ex. F.

On April 22, 2014, PIC sent Skotnicki a notice that the Original Policy would not be renewed effective May 29, 2014 because "THERE IS A SUBSTANTIAL CHANGE OR INCREASE IN HAZARD IN THE RISK ASSUMED BY THE COMPANY SUBSEQUENT TO THE DATE THE POLICY WAS FIRST ISSUED, AS DESCRIBED BELOW: THERE IS AN ANIMAL OR PET THAT HAS BITTEN OR INJURED." Skotnicki Amended Br. Ex. B.[5] On April 30, 2014, Skotnicki requested that the Department's Bureau of Consumer Services (BCS) review PIC's non-renewal because the dog bite was provoked. On May 28, 2014, BCS issued an Investigative Report Order to PIC which stated:

> **It is our finding that [PIC] by its action, is in violation of Act 205. [Skotnicki] provides a narrative explaining how this dog bite occurred. [PIC] did not comment on the circumstances surrounding this bite in the response dated May 12, 2014.[6] Our Department requested [PIC's] narrative and details of the claim on May 21, 2014 and to date we have no record of a response.**

---

[5] By June 8, 2015 order, this Court authorized Skotnicki to amend his brief to include exhibits to be considered part of his original reproduced record.

[6] PIC's May 12, 2014 response was not included in this record.

2

> **Based on [Skotnicki's] narrative[,] this appears to have been a provoked dog bite incident[.] As [PIC] has not justifiably proven any increase in hazard, [PIC] is directed to continue the [Original P]olicy with no lapse in coverage.**
>
> Please confirm the continuation of coverage to [Skotnicki] no later than ten (10) days from the date you receive this Investigative Report/Order.

R.R. at 20a (emphasis in original). Rather than continuing the Original Policy, PIC issued a New Policy because

> due to system limitations, once a policy at [PIC] has been terminated for more than five days . . . past the expiration date of a policy[,] there's no physical way to reinstate it. So instead we reissue a new policy, but in all respects, the new policy is not treated as new business[;] it's treated as a continuation.

R.R. at 71a-72a. PIC deems new policies issued in these circumstances effective without lapse. *See* R.R. at 72a.

On June 18, 2014, PIC sent Skotnicki notice of the New Policy's cancellation effective July 25, 2014 based again upon "A SUBSTANTIAL CHANGE OR INCREASE IN HAZARD IN THE RISK ASSUMED . . . [due to a] pet on the residence premises that has exhibited dangerous propensities by biting a person without provocation." R.R. at 6a, 13a. Skotnicki requested BCS' review of the cancellation notice. In its July 14, 2014 Investigative Report, BCS stated: "Our investigation has determined that [PIC] met the requirements of Act 205 and the [Department] therefore finds that your [New P]olicy may be terminated." R.R. at 22a. On July 23, 2014, Skotnicki appealed from the BCS' Investigative Report, and a hearing was held on September 30, 2014 before an Administrative Law Judge (ALJ). The Commissioner issued his January 15, 2015 adjudication and order affirming the New

Policy's cancellation because PIC did not violate Act 205. Skotnicki appealed to this Court.[7]

## Substantial Evidence

Skotnicki argues that substantial evidence did not support the Commissioner's conclusion that PIC properly cancelled the New Policy due to a substantial change in PIC's assumed risk resulting from an unprovoked dog bite. Act 205 prohibits persons in the insurance business from engaging in unfair or deceptive insurance practices. *Nationwide Mut. Fire Ins. Co. v. Ins. Dep't*, 4 A.3d 231 (Pa. Cmwlth. 2010). Section 5(a)(9) of Act 205 defines "unfair or deceptive acts or practices" to include, in relevant part:

> Cancelling any policy of insurance covering owner-occupied private residential properties . . . that has been in force for sixty days or more or refusing to renew any such policy unless . . . there has been **a substantial change or increase in hazard in the risk assumed by the company subsequent to the date the policy was issued**[.]

40 P.S. § 1171.5(a)(9) (emphasis added). "The term 'substantial change or increase in hazard' in Section 5(a)(9) of [Act 205] . . . has been defined as a risk that an insurance company could not have reasonably been presumed to have contracted for when the policy was written." *Aegis Sec. Ins. Co. v. Pa. Ins. Dep't*, 798 A.2d 330, 332 (Pa. Cmwlth. 2002). "The standard to apply in determining whether an incident involving a particular dog represents a substantial increase in hazard is whether or not that dog was provoked. If a dog is provoked, no increase in hazard exists." *Id.* at

---

[7] This Court's review of the Commissioner's adjudication and order is limited to whether an error of law was committed, constitutional rights were violated or necessary factual findings are supported by substantial evidence. *Donegal Mut. Ins. Co. v. Ins. Dep't*, 719 A.2d 825 (Pa. Cmwlth. 1998). "To the extent the Commissioner's findings represent credibility determinations, they are not reviewable on appeal as a matter of administrative law." *Nationwide Mut. Fire Ins. Co. v. Ins. Dep't*, 4 A.3d 231, 234 n.3 (Pa. Cmwlth. 2010).

334. Section 5(a)(9) of Act 205's cancellation notice requirements are to be strictly construed in Skotnicki's favor and against PIC. *See Statesman Ins. Co. v. Ins. Dep't*, 528 A.2d 1042 (Pa. Cmwlth. 1987).

Skotnicki requested the Commissioner's review of PIC's non-renewal notice. BCS' review included "the consumer['s unchallenged] . . . narrative explaining how this dog bite occurred." R.R. at 20a. The narrative consisted of Weiser's notes of Susan Skotnicki's July 25, 2013 interview, which reflect that the dog had never before shown aggression or bitten anyone, except on July 3, 2013. The interview notes provided, in pertinent part:

> [Susan Skotnicki] was crossing the street, just about up at the curb and onto her property when the [neighbor] who had just moved into the neighborhood was taking a walk[,] so they struck up conversation. She stated he walked over to where they were . . . when out of the blue he bit the [neighbor] in the back of the calf. She stated he didn't bark or growl, it was just sudden. She stated he took her by surprise as he's never done that before.

Skotnicki Amended Br. Ex. F at 1.[8] BCS determined "[b]ased on [Susan Skotnicki's] narrative[, that] this appears to have been a provoked dog bite incident" and, therefore, PIC must continue Skotnicki's coverage. R.R. at 20a.

In response, PIC continued Skotnicki's coverage[9] and requested a formal administrative hearing. According to McGilpin, PIC ultimately withdrew its hearing

---

[8] The narrative was admitted into the record at the September 30, 2014 hearing over Skotnicki's objection to the narrative's accuracy. *See* R.R. at 82a-83a.

[9] Although compelling, Skotnicki's averment that PIC issued the New Policy as an end run around BCS' May 28, 2014 order because with the New Policy came a new cancellation opportunity lacks support in this record. At the time PIC elected not to renew the Original Policy, the Original Policy was due to expire effective May 29, 2014. BCS' May 28, 2014 Investigative Report Order required PIC to continue Skotnicki's coverage "with no lapse." R.R. at 20a. PIC explained that its system required it to issue the New Policy to comply with BCS' Investigative Report Order, so Skotnicki's coverage did not lapse. Skotnicki's statement during McGilpin's cross-examination that he received a new policyholder welcome packet does not constitute evidence

5

request because the non-renewal notice was faulty and would not have withstood an Act 205 review because it did not expressly state that the dog bite was provoked and, "under Act 205[,] . . . a dog bite alone is not sufficient to justify termination of a policy."[10]  R.R. at 74a.

PIC issued its New Policy cancellation notice because the bite occurred "without provocation," and Skotnicki again requested review.  R.R. at 6a.  Six weeks after BCS originally declared that "[b]ased on the insured's narrative this appears to have been a provoked dog bite incident" and PIC had not "justifiably proven any increase in hazard," R.R. at 20a,  BCS held, without taking additional evidence, that since PIC "met the requirements of Act 205[,] . . . [the] policy may be terminated." R.R. at 22a.  Skotnicki requested a formal hearing.

At the September 30, 2014 hearing, Weiser testified that when she took the July 25, 2013 statement, Susan Skotnicki did not specifically state that she or Skotnicki felt threatened by the neighbor when the dog bit him.  When asked: "At any point did [Susan] Skotnicki indicate to you that the [neighbor] provoked the dog into biting him?" Weiser responded: "No."  R.R. at 61a.  Weiser acknowledged that since the neighbor had counsel she did not speak directly to him about the dog bite, but she did not believe the neighbor would have supplied any more information than Susan Skotnicki already had.  Weiser described that, based upon her investigation, PIC was fully liable for the neighbor's damages.

Susan Skotnicki agreed that the statement she gave Weiser does not reflect that the neighbor startled them prior to the dog bite.  She explained:

> Because in my view [']out of the blue['] to me meant that I
> had no warning, you know.  So, the dog was startled.  I

_____

to the contrary.  *See* R.R. at 75a.  Further, had PIC's system allowed for the Original Policy's continuance, nothing prevented PIC from similarly cancelling the Original Policy.

[10]  On June 19, 2014, the Department granted PIC's withdrawal motion and discontinued the appeal.  *See* Skotnicki Amended Br. Ex. D.

6

didn't really --- hadn't really ---.  When I talked to her it was three weeks after and I figured that the dog was protecting me and all that, but I hadn't like put it together that --- to use the proper term provoked or unprovoked. The truth is [the neighbor] walked towards us.

R.R. at 108a.  She described that the neighbor, wearing sunglasses and a hat, was in the middle of the street and began walking toward her and Skotnicki striking up a conversation.  Susan Skotnicki expounded:

> [The neighbor] keeps coming and that was why the statement --- I mean, I don't feel that my statement is ---.  I feel it's consistent with the provoked attack.  I just stated the facts.  That's what [']out of the blue['] to me was, he startled the dog and the dog bit him.
>
> He was close enough to me, I couldn't tell you if he was one foot, two foot, that the leash never moved.  I mean, he was in my area and the dog reached around.  [The dog d]idn't have to like go too far.

R.R. at 110a-111a.  She concluded: "I think that turn from the center of the road and direct brisk walk, you know, like towards me is what provoked [the dog] i[n] my opinion."  R.R. at 112a.  Susan Skotnicki admitted that she did not tell Weiser that she felt threatened because she did not feel that way but, rather, "the dog did."  R.R. at 113a.

Skotnicki testified that as he and his wife were returning home from a short walk, the neighbor called out to them from the middle of the street and approached them "real quickly right into us" wearing a hat and sunglasses and, since they had not met the man before, he startled them and the dog.  R.R. at 93a.  He explained: "He encroached, you know, as a stranger.  He just came into us abruptly and Sue and I were sort of startled because we don't know who this stranger is."  R.R. at 100a.  When the ALJ asked: "Did he gesture in any way towards the dog, or you or Sue?"  Skotnicki responded: "It was just a fast walk into him."  R.R. at 100a. Skotnicki described that "without any warning this guy's leg[']s right in front of [the

7

dog] and [the dog] bit him once and that was it." R.R. at 93a. Skotnicki declared that the neighbor's actions provoked the dog. He expressed that his testimony does not differ from his wife's July 25, 2013 statement to Weiser.

This Court has held:

Generally, substantial evidence is such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. Evidence becomes insubstantial only when it is clear that it is so inadequate and contradictory that an administrative finding based on it becomes mere conjecture. And, this Court must examine the testimony in the light most favorable to the party prevailing in the proceeding below and give that party the benefit of any inferences that can be logically and reasonably drawn from the evidence. Also, the [] Commissioner's determination of witness credibility is within [his] exclusive province as the finder of fact and is not subject to review by this Court.

*Aegis*, 798 A.2d at 333-34 (citations omitted).

Here, the Commissioner found that

[b]oth Skotnicki and his wife testified that their dog bit someone who simply walked rapidly up to them to begin a conversation on the side of a public street. . . . Even though the [neighbor] came close to the couple, the [Skotnickis] presented no evidence that he made any threatening gestures toward the dog or [Skotnicki's] wife.

R.R. at 162a. The Commissioner further stated that "neither [Skotnicki] nor his wife's description of the incident support th[e] argument" that the dog bite was provoked. R.R. at 162a. The Commissioner concluded, in pertinent part:

5. When an insurer relies upon an increase in hazard from the policy inception because the insured's dog allegedly bites someone, the insurer must establish either that the insureds had no dog at policy inception or did not have a dog with vicious propensities.

6. A single, unprovoked dog bite constitutes an increase in hazard when the dog remains with the insured because there is an increase in potential liability if a second bite occurs.

8

7. Absent competent evidence of provocation, [PIC] has met its burden of establishing an increase in hazard as a result of the dog bite at issue in this case.

8. [PIC] satisfied its burden of proving compliance with Act 205.

R.R. at 168a-169a.

Based upon the *Aegis* Court's holding, whether a dog bite incident rises to the level of "a substantial increase in hazard" depends upon whether the dog was provoked. *Id.* at 334. "Provoke" is not defined in the context of this case. Thus, we look to dictionary definitions to ascertain the term's plain and ordinary meaning.[11] According to *Merriam-Webster's Collegiate Dictionary* (11th ed. 2004), "provoke" means "to arouse to a feeling or action . . . to incite to anger . . . to call forth (as a feeling or action) : EVOKE . . . to stir up purposely . . . to provide the needed stimulus for[.]" *Id.* at 1002. *Black's Law Dictionary* (9th ed. 2009) defines "provocation" as "the act of inciting another to do something . . . . Something (such as words or actions) that affects a person's reason and self-control[.]" *Id.* at 1346 (emphasis omitted).

In *Aegis*, the only case specifically applying the provocation standard under Act 205, this Court stated:

In applying th[e provocation] standard, the Commissioner previously found that such an increase did not exist where a dog bit a person who entered a property through a gate marked 'Beware of Dog' and ignored a sign instructing those who entered to ring a bell. *In re White (Liberty Mut*[.]*),* No. PH97-07-016 (Pa.Ins.Comm'r, Dec. 30, 1997).[FN5] An increase did not exist where a child was bitten when it approached a dog that had just been given its dinner where the dog had never before shown aggression.

---

[11] In *Eritano v. Commonwealth*, 690 A.2d 705 (Pa. 1997), the Pennsylvania Supreme Court used dictionary definitions to ascertain the plain and ordinary meaning of the term "provoke" as it is used in Section 502-A of the Dog Law, Act of December 7, 1982, P.L. 784, *as amended,* 3 P.S. § 459-502-A.

*In re Ranieli (White Hall Mut*[.]*),* No. P94-11-030 (Pa. Ins. Comm'r, Jan. 17, 1997). An increase *did* exist where the incident was the third in which a particular dog had bitten people. *In re Witmyer (Lititz Mut*[.]*),* No. P94-03-13 (Pa.Ins.Comm'r, Oct. 31, 1995). And, an increase existed where a Rottweiler left its owners' property, followed and viciously attacked a person. *In re Wetzel & Bresinger (Charter Oak),* PH96-09-019 (Pa. Ins. Comm'r, June 30, 1998). The common thread that binds these cases is provocation. In the first two cases, where no increase in risk was found, the dogs were determined to have been provoked into attacking; in the second two, where an increase was found to exist, the dogs attacked without provocation.

> [FN]5. This citation and those that immediately follow refer to adjudications by the Insurance Commissioner. Although we recognize that we are not bound by these adjudications, *Standard Fire Ins*[.] *Co*[.] *v. Ins*[.] *Dep*[*'t*]*, . . .* 611 A.2d 356 ([Pa. Cmwlth.] 1992), we nevertheless find them instructive here.

We find the same thread of provocation when we examine the statute regulating dogs within our Commonwealth. Section 502-A of the Dog Law,[FN]6 3 P.S. § 459-502-A, uses provocation as a criterion in determining whether a dog is a dangerous dog. Section 502-A provides, in relevant part, as follows:

> The owner or keeper of the dog shall be guilty of the summary offense of harboring a dangerous dog if the [magisterial] district ju[dge] finds beyond a reasonable doubt that the following elements of the offense have been proven:
>
> (1) The dog has done one or more of the following:
>
> > (i) Inflicted severe injury on a human being without provocation on public or private property.
> >
> > (ii) Killed or inflicted severe injury on a domestic animal without provocation while off the owner's property.

(iii) Attacked a human being without provocation.

(iv) Been used in the commission of a crime.

(2) The dog has either or both of the following:

(i) A history of attacking human beings and/or domestic animals[, dogs or cats] without provocation.

(ii) A propensity to attack human beings and/or domestic animals[, dogs or cats] without provocation. A propensity to attack may be proven by a single incident of the conduct described in paragraph (1)(i), (ii), (iii) or (iv).

3 P.S. § 459-502-A.

Our courts have determined dogs to be dangerous where a person who did not excite or provoke a dog in any way was attacked while walking away from it. *Commonwealth v. Baldwin,* 767 A.2d 644 (Pa. Cmwlth. 2001). A dog was determined to be dangerous where it escaped from a house, ran into the street and attacked without provocation. *Commonwealth v. Hake,* 738 A.2d 46 (Pa. Cmwlth. 1999)[.]

[FN]6. Act of December 7, 1982, P.L. 784, *as amended,* 3 P.S. § 459-101 – 459-1205.

*Aegis*, 798 A.2d at 332-33.

In *Aegis*, Aegis cancelled Kelly Broschart's (Broschart) homeowners' insurance policy because Broschart's dog's attack of a State Trooper constituted a substantial increase in hazard subsequent to their insurance policy's inception. On appeal, the Commissioner held that the cancellation violated Act 205 since the attack was provoked. Because the following substantial evidence supported the Commissioner's finding that the attack was provoked, this Court affirmed the Commissioner's decision:

[The State Trooper] had previously approached the Broschart house from the driveway without incident when

11

[the dog] was present, that he approached the property on the day he was bitten in a way that [the dog] was not accustomed to seeing strange adults approach, and that he waved a hard leather portfolio in her direction when she got close to him. . . . [T]he record reflects that [the dog] was provoked when the trooper passed a 'No Trespassing' sign, appeared to [the dog] to be someone who did not belong, and made what [the dog] interpreted as a threatening gesture.

*Id.* at 334. The instant case presents none of the same or similar "provocation" indicia.

In *Commonwealth v. Civello* (Pa. Cmwlth. No. 1998 C.D. 2013, filed February 1, 2013),[12] a dog owner approached his neighbor (the victim) at the curb on a public street and talked to her for a few minutes. Because the victim feared the dog, she took a step back from him, at which point the dog jumped up and bit her on the hip. This Court upheld the trial court's determination that the attack was unprovoked because the victim did not touch or otherwise incite the dog's behavior and, therefore, the owner harbored a dangerous dog under Section 502-A of the Dog Law.

After a thorough review of the record, we conclude that substantial evidence supports the Commissioner's findings that the Skotnickis' dog suddenly and without warning bit the neighbor who approached on a public street in a non-threatening manner, and that those findings support the Commissioner's conclusion that the Skotnickis' dog attacked the neighbor without provocation. Accordingly, PIC properly cancelled the New Policy due to a substantial change in PIC's assumed risk.

Skotnicki also contends that the Commissioner impermissibly relied upon Weiser's hearsay testimony to determine that the dog bite was unprovoked. *See*

---

[12] This Court's unreported memorandum opinions may be cited "for [their] persuasive value, but not as a binding precedent." Section 414 of the Commonwealth Court's Internal Operating Procedures.

Skotnicki Amended Br. at 25-26. The Department rejoins that Skotnicki failed to raise this issue before the Department and therefore it is waived. "Issues not raised before [the Department] are waived and may not be raised for the first time on appeal. Pa.R.A.P. 1551; *Prudential Prop*[.] [*&*] *Cas*[.] *Ins*[.] *Co. v. Dep*[*'t*], . . . 595 A.2d 649 ([Pa. Cmwlth.] 1991)." *Kramer v. Dep't of Ins.*, 654 A.2d 203, 205 (Pa. Cmwlth. 1995); *see also Robbins v. Ins. Dep't*, 11 A.3d 1048 (Pa. Cmwlth. 2010). Because Skotnicki did not present this issue to the Department, it has been waived.[13]

Notwithstanding, "[h]earsay is defined as a 'statement, other than one made by the declarant while testifying at the trial or hearing offered in evidence to prove the truth of the matter asserted.' Pa.R.E. 801(c)." *Yost v. Unemployment Comp. Bd. of Review,* 42 A.3d 1158, 1163 (Pa. Cmwlth. 2012). Among the well-recognized exceptions to the hearsay rule is what is known as the business records exception which provides:

> **Records of a Regularly Conducted Activity.** A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if,
>
> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a 'business', which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;
>
> (C) making the record was a regular practice of that activity;

---

[13] "The purpose of Pa.R.A.P. 1551 is to provide the lower tribunal with an opportunity to correct alleged errors, thus increasing the efficient use of judicial resources by obviating the need for appellate review." *Zong v. Ins. Dep't*, 614 A.2d 360, 363 (Pa. Cmwlth. 1992).

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) neither the source of information nor other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6). Accordingly, Section 6108(b) of the Uniform Business Records as Evidence Act provides:

A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.

42 Pa.C.S. § 6108(b).

Thus, as in this case, where the record is clear that Weiser obtained and recorded Susan Skotnicki's statement near the time of the event, and then maintained it as part of PIC's dog bite claim investigation, *see* R.R. at 60a-63a, the circumstances justify a presumption of trustworthiness sufficient to offset the hearsay character of the evidence. *See Paey Assocs. v. Pa. Liquor Control Bd.*, 78 A.3d 1187 (Pa. Cmwlth. 2013). Therefore, we conclude that the narrative is not hearsay.

Moreover, "[i]t has long been established in this Commonwealth that hearsay evidence, *properly objected to*, is not competent evidence to support a finding of the [administrative agency], whether or not corroborated by other evidence." *Myers v. Unemployment Comp. Bd. of Review*, 625 A.2d 622, 625 (Pa. 1993); *see also Walker v. Unemployment Comp. Bd. of Review*, 367 A.2d 366 (Pa. Cmwlth. 1976). However, "[h]earsay evidence, [a]dmitted without objection, will be given its natural probative effect and may support a finding . . . , [i]f it is corroborated by any competent evidence in the record[.]" *Id.* at 370.

14

Here, it is clear that the Commissioner relied upon Weiser's testimony to authenticate her narrative of Susan Skotnicki's statement, and made his provocation determination based upon the narrative and the Skotnickis' hearing testimony. Skotnicki made no hearsay objection to either Weiser's testimony or to the narrative's admission.[14] The Skotnickis' testimony corroborated Susan Skotnicki's statement to Weiser and Weiser's hearing testimony that the neighbor approached the Skotnickis on the street in a manner Susan Skotnicki did not deem threatening to her, and the dog bit the neighbor "out of the blue." Therefore, the Commissioner's findings and conclusions could rely thereon. R.R. at 110a.

Skotnicki further claims that the Commissioner is bound by the May 28, 2014 Investigative Report Order in which BCS stated that the dog bite incident was

---

[14] The Pennsylvania Supreme Court has long held that "any layperson choosing to represent himself in a legal proceeding must, to some reasonable extent, assume the risk that his lack of expertise and legal training will prove his undoing." *Vann v. Unemployment Comp. Bd. of Review*, 494 A.2d 1081, 1086 (Pa. 1985) (quoting *Groch v. Unemployment Comp. Bd. of Review*, 472 A.2d 286, 288 (Pa. Cmwlth. 1984)). More recently, this Court clarified that, "referees should reasonably assist pro se parties to elicit facts that are probative for their case." *Hackler v. Unemployment Comp. Bd. of Review*, 24 A.3d 1112, 1115 (Pa. Cmwlth. 2011).

> The referee has a responsibility . . . to assist a pro se claimant at a hearing so that the facts of the case necessary for a decision may be adequately developed to insure that compensation will not be paid in cases in which the claimant is not eligible and that compensation will be paid if the facts, *thoroughly developed,* entitled the claimant to benefits.

*Id.* at 1115 (quoting *Bennett v. Unemployment Comp. Bd. of Review,* 445 A.2d 258, 259 (Pa. Cmwlth. 1982)). Although the law requires that the referee reasonably assist in development of the facts necessary to render a decision, "the referee is not required to become and should not assume the role of a claimant's advocate." *McFadden v. Unemployment Comp. Bd. of Review*, 806 A.2d 955, 958 (Pa. Cmwlth. 2002). "**The referee need not advise an uncounseled claimant on specific evidentiary questions or points of law, nor need the referee show any greater deference to an uncounseled claimant than that afforded a claimant with an attorney**." *Brennan v. Unemployment Comp. Bd. of Review*, 487 A.2d 73, 77 (Pa. Cmwlth. 1985) (citation omitted; emphasis added). Here, the Commissioner specifically asked Skotnicki: "Do you have any objection to the admission of Exhibit Number T-2 [Claim Information?]" Skotnicki replied: "Only to its accuracy, Your Honor." R.R. at 82a.

provoked. Under Section 59.7(e)(4) of the Department's Regulations, formal Department hearings are *de novo* and, thus, the Commissioner may accept additional evidence. 31 Pa. Code § 59.7(e)(4) ("All relevant evidence of reasonable probative value will be admitted into the record of the proceeding and reasonable examination and cross-examination shall be permitted."). Moreover, Department proceedings are generally governed by the General Rules of Administrative Practice and Procedure (GRAPP).[15] Section 31.3 of GRAPP states that an agency's record consists, *inter alia*, of filings and submittals to the agency, the hearing transcript and exhibits received into evidence. 1 Pa. Code § 31.3. Accordingly, nothing in the Department's Regulations or GRAPP makes the Commissioner bound solely by the May 28, 2014 Investigative Report Order.

Further, Skotnicki's claim notwithstanding, the collateral estoppel doctrine does not apply in this case.

> The doctrine of collateral estoppel bars relitigation of an issue where a question of law or fact essential to a judgment was actually litigated and determined by a court of competent jurisdiction. Collateral estoppel applies only when the issue decided in the prior case and the issue presented in the current case are identical; there was a final judgment on the merits; the issue was essential to the judgment; the party against whom estoppel is asserted had a full and fair chance to litigate the merits; and the party against whom estoppel is asserted was a party or in privity with a party in the prior case.

*Foster v. Colonial Assur. Co.*, 668 A.2d 174, 180-81 (Pa. Cmwlth. 1995) (citation omitted), *aff'd*, 673 A.2d 922 (Pa. 1996).

> Application of the principle of collateral estoppel is not precluded merely because administrative proceedings are involved: when an administrative agency is acting in a

---

[15] 1 Pa. Code §§ 31.1-35.251. *See* Sections 56.1 and 59.7(e)(5) of the Department's Regulations, 31 Pa. Code §§ 56.1, 59.7(e)(5); *see also Park v. Chronister*, 617 A.2d 863 (Pa. Cmwlth. 1992); *Celane v. Ins. Comm'r*, 415 A.2d 130 (Pa. Cmwlth. 1980).

judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the court will not hesitate to apply collateral estoppel principles.

*Christopher v. Council of Plymouth Twp.*, 635 A.2d 749, 752 n.2 (Pa. Cmwlth. 1993); *see also Knox v. Pa. Bd. of Prob. & Parole*, 588 A.2d 79 (Pa. Cmwlth. 1991).

In this case, there is no dispute that the BCS reviews involved both PIC and Skotnicki, and that both parties had a full and fair opportunity to litigate PIC's termination of Skotnicki's homeowner's coverage following the July 3, 2013 dog bite incident. However, the decisions differed in that one action progressed only through a first-level BCS review, while the other was subjected to a *de novo* hearing at which additional evidence was accepted.[16] Under the specific circumstances of this case, in which BCS' May 28, 2014 Investigative Report Order makes clear that based upon the limited information before it, the July 3, 2013 dog bite incident "**appears** to have been a provoked[,]" collateral estoppel did not bar the Commissioner from reaching a different result based upon a new policy termination, additional evidence and credibility determinations. R.R. at 20a (emphasis added).

Contrary to Skotnicki's contention that the BCS' May 28, 2014 Investigative Report Order was an adjudication, the BCS clearly stated therein: *"[B]e advised that this communication does not constitute an adjudication under the Administrative Agency Law*." [17] R.R. at 21a (emphasis in original). Certainly, if the Commissioner was bound by BCS' investigative reports, the second-level *de novo*

---

[16] In light of the fact that the New Policy was a continuation of the Original Policy, the differing policy numbers alone does not create a distinction sufficient to make collateral estoppel inapplicable in this case. Moreover, the fact that one action involved a non-renewal and the other involved cancellation is a distinction without a difference where both actions are subject to the same requirements under Section 5(a)(9) of Act 205 and Section 59.7 of the Department's Regulations.

[17] The same language was in BCS' July 14, 2014 report. *See* R.R. at 9a.

17

review afforded by Section 59.7(e)(4) of the Department's Regulations would have little value. Accordingly, Skotnicki's argument cannot stand.

## Non-Attorney Representative

Skotnicki also argues that the Commissioner erred by permitting McGilpin to represent PIC at the hearing. "It is well settled that with a few exceptions, non-attorneys may not represent parties before the Pennsylvania courts and most administrative agencies." *In re Estate of Rowley*, 84 A.3d 337, 340 (Pa. Cmwlth. 2013). Pennsylvania courts have more specifically held that corporations may not act pro se in court, and that non-attorneys may not represent them, regardless of the individual's status as the corporation's officer, director, shareholders or employee.[18] *See Estate of Rowley*; *Sklar v. Dep't of Health*, 798 A.2d 268 (Pa. Cmwlth. 2002); *Spirit of the Avenger Ministries v. Commonwealth*, 767 A.2d 1130 (Pa. Cmwlth. 2001); *Walacavage v. Excell 2000, Inc.*, 480 A.2d 281 (Pa. Super. 1984).

"However, this rule is not without exceptions in the administrative agency arena." *Nolan v. Dep't of Pub. Welfare*, 673 A.2d 414, 417 (Pa. Cmwlth. 1995). Section 31.23 of GRAPP provides: "A person shall not be represented at a hearing before an agency head or a presiding officer except: (1) **As stated in § 31.21** or § 31.22 (relating to appearance in person; and appearance by attorney). (2) **As otherwise permitted by the agency in a specific case**." 1 Pa. Code § 31.23 (emphasis added).

---

[18] "The reasoning behind the rule is that 'a corporation can do no act except through its agents and that such agents representing the corporation in Court must be attorneys at law who have been admitted to practice, are officers of the court and subject to its control.'" *Walacavage v. Excell 2000, Inc.*, 480 A.2d 281, 284 (Pa. Super. 1984) (quoting *MacNeil v. Hearst Corp.*, 160 F.Supp. 157, 159 (D. Del. 1958)).

18

Section 31.21 of GRAPP provides, in pertinent part:

> An individual may appear [o]n his own behalf. A . . . bona fide officer of a corporation . . . may represent the corporation. . . . Parties, except individuals appearing [o]n their own behalf, shall be represented in adversary proceedings only under § 31.22 (relating to appearance by attorney).

1 Pa. Code § 31.21. Thus, Section 31.23 of GRAPP creates exceptions to the general prohibition against corporations' non-attorney representation under circumstances in which the representative is a bona fide corporate officer, or as Commonwealth agencies expressly permit in specific cases.

Here, because there is no record evidence that McGilpin was PIC's corporate officer, he could only represent PIC before the Department if the Department expressly permitted him to do so in this specific case, which it did. The Department's July 31, 2014 hearing notice stated: "**Each party may appear with or without counsel** and offer relevant testimony and/or other relevant evidence." R.R. at 26a (emphasis added). By September 25, 2014 letter, McGilpin notified the Department and Skotnicki, in compliance with Section 59.10 of the Department's Regulations, that he "will be representing [PIC] at the . . . proceeding."[19] R.R. at 33a. Neither the Department nor Skotnicki objected. Moreover, when the hearing commenced, the ALJ confirmed: "[Y]ou're all prepared to proceed without counsel; is that correct Mr. Skotnicki and Mr. McGilpin?" R.R. at 44a. Skotnicki replied,

---

[19] Section 59.10 of the Department's Regulations states:

> Each insurer shall file within 30 days of the effective date of this Chapter, with the Department, the names of its representatives who are to be notified in the event that an insured or an applicant requests the [] Department to review a cancellation or refusal to renew, involving that insurer.

31 Pa. Code § 59.10.

"Yes."[20]   R.R. at 44a.   The record evidence makes clear that the Department expressly authorized McGilpin to represent PIC in this specific case and, thus, the Commissioner did not err by upholding the ALJ's determination relative to that issue.

In reaching this conclusion, we are not persuaded by McGilpin's claim that he has attended Department hearings in this capacity many times before, or the ALJ's statement that the Department "permit[s] representatives of insurance companies to present testimony and evidence on behalf of the company without requiring legal representation."[21]   R.R. at 48a; *see* also R.R. at 47a-48a.   Neither Section 31.23 of GRAPP, nor any other statute or regulation which has been cited or our research has disclosed, authorizes the Department to have a general policy under which non-attorneys may represent corporations in proceedings before it. "Commonwealth agencies have no inherent power to make law or otherwise bind the public or regulated entities.   Rather, an administrative agency may do so only in the fashion authorized by the General Assembly . . . ." *Nw. Youth Servs., Inc. v. Dep't of Pub. Welfare*, 66 A.3d 301, 310 (Pa. 2013).

> Where an agency, acting pursuant to delegated legislative authority, seeks to establish a substantive rule creating a controlling standard of conduct, it must comply with the provisions of the Commonwealth Documents Law.[FN]7 That statute sets forth formal procedures for notice, comment and ultimate promulgation in connection with the making of rules that establish new law, rights or duties. Such substantive regulations, sometimes known as legislative rules, when properly enacted under the Commonwealth Documents Law, have the force of law . . . .

---

[20] It was not until Skotnicki presented his case that he moved to have McGilpin disqualified from representing PIC at the hearing because he is not a licensed attorney.  *See* R.R. at 47a.

[21] We acknowledge that this Court stated in *Robbins v. Insurance Department*, 11 A.3d 1048, 1051 n.3 (Pa. Cmwlth. 2010), "that [insurance] companies are not required to appear through counsel at [Department] hearings."   However, since the non-attorney representative in *Robbins* was a bona fide officer of the subject corporation, the requirements of Section 31.23 of GRAPP were nevertheless met in that case.

20

> [FN]7 Act of July 31, 1968, P.L. 769, No. 240 (current version at 45 P.S. §§ 1102 - 1208). The short title of the law was eliminated by subsequent amendment; however, it remains the prevailing convention used for sake of reference.

*Borough of Pottstown v. Pa. Mun. Ret. Bd.*, 712 A.2d 741, 743 (Pa. 1998).

If the Department wishes to authorize non-attorney representation of insurance companies at its hearings, it must properly promulgate a regulation authorizing the same. Until such time, the Department is on notice that any general practice of "permit[ting] representatives of insurance companies to present testimony and evidence on behalf of the company without requiring legal representation" or representation by a corporate officer, is unlawful.[22] R.R. at 48a.

### Administrative Notice

Lastly, Skotnicki argues that the Commissioner erred by taking administrative notice post-hearing that the form PIC used to cancel the New Policy was Department-approved. Section 5(a)(9)(i) of Act 205 requires that insurance policy cancellation notices meet specific requirements, and "[b]e approved as to form by the [Commissioner] prior to use." 40 P.S. § 1171.5(a)(9)(i); *see also* 31 Pa. Code §§ 59.5, 59.6. The New Policy cancellation notice was admitted into the hearing record. McGilpin did not have direct knowledge as to whether the Department had

---

[22] It is unclear whether non-attorneys representing corporations in specific Department proceedings would constitute an unauthorized practice of law. McGilpin elicited testimony and admitted documents to facilitate fact-gathering to assist with the Commissioner's decision-making, and he provided testimony that clarified PIC procedures. In rendering its decision, the Department relied on *Harkness v. Unemployment Compensation Board of Review*, 920 A.2d 162 (Pa. 2007). In *Harkness*, our Supreme Court undertook a detailed analysis of whether representation before a government agency constitutes the practice of law where such proceedings are meant to be informal, speedy and low-cost, and evidentiary rules are not strictly applied. *Harkness* was decided under the Unemployment Compensation Law, Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. §§ 751-918.10, which expressly authorizes employer corporations to be represented by non-lawyers and, thus, is inapposite.

21

pre-approved PIC's cancellation notice form. *See* R.R. at 79a. However, in the adjudication, the Commissioner took "administrative notice that the form of the notice used by [PIC] has been approved by the Department." R.R. at 160a.

Section 35.173 of GRAPP states: "Official notice may be taken by the agency head or the presiding officer of such matters as might be judicially noticed by the courts of this Commonwealth, or any matters as to which the agency by reason of its functions is an expert." 1 Pa. Code § 35.173. Moreover, this Court has specifically held:

> 'Official notice' is the administrative counterpart of judicial notice and is the most significant exception to the exclusiveness of the record principle. **The doctrine allows an agency to take official notice of** facts which are obvious and notorious to an expert in the agency's field and **those facts contained in reports and records in the agency's files**, in addition to those facts which are obvious and notorious to the average person. Thus, official notice is a broader doctrine than is judicial notice and **recognizes the special competence of the administrative agency in its particular field and** also recognizes that **the agency is a storehouse of information on that field** consisting of reports, case files, statistics and other data relevant to its work.

*Ramos v. Pa. Bd. of Prob. & Parole*, 954 A.2d 107, 110 (Pa. Cmwlth. 2008) (emphasis added) (quoting *Falasco v. Pa. Bd. of Prob. & Parole,* 521 A.2d 991, 995 n.6 (Pa. Cmwlth. 1987)). Here, the Department's approval of PIC's cancellation notice form was within the Department's exclusive province; therefore, the Commissioner appropriately took official notice of that fact.

For all the above reasons, the Commissioner's adjudication and order is affirmed.

_____
ANNE E. COVEY, Judge

22

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gregory G. Skotnicki,          :
             Petitioner      :
                              :
          v.             :
                              :
Insurance Department,     :     No. 156 C.D. 2015
             Respondent   :

## O R D E R

AND NOW, this 17th day of August, 2016, the Pennsylvania Insurance Department Commissioner's January 15, 2015 adjudication and order is affirmed.

_____
ANNE E. COVEY, Judge